UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:17-cr-00306-JCM-PAL |
| Plaintiff, | **REPORT OF FINDINGS AND RECOMMENDATION** |
| v. | |
| JOHN TELUSMA, | (Mot Suppress – ECF No. 475) |
| Defendant. | |

Before the court is defendant John Telusma's ("Telusma") Motion to Suppress Evidence (ECF No. 475), which was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4 of the Local Rules of Practice.  The court has considered the motion, the government's Opposition (ECF No. 515), and Telusma's Reply (ECF No. 522).[1]

## BACKGROUND

### I.   THE INFRAUD INDICTMENT

Mr. Telusma (a.k.a. "John Westley Telusma," "Peterelliot," "Pete," "Pette") and 34 co-defendants are charged in a Second Superseding Indictment (ECF No. 303) ("Infraud indictment") returned January 30, 2018.[2]  This case arises out of allegations that the defendants operated a criminal organization known as the "Infraud Organization" ("Infraud") in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968. Defendants allegedly engaged in identity theft and financial fraud with acts that include, but are

---

[1]  Defendant Pius Wilson filed an omnibus Motion for Joinder (ECF No. 481) seeking to adopt the motions of his co-defendants to the extent any motion is applicable to him.  The current motion argues that Choichiu's Fourth Amendment rights were violated when the government executed a search warrant at his residence.  Because Fourth Amendment rights are personal rights, they may not be vicariously asserted. *Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978).  Wilson does not specifically claim the search warrant or Chichiu's arguments apply to him.  Thus, Wilson's joinder request is denied as to this motion. *See United States v. Lopez-Cruz*, 730 F.3d 803, 807 (9th Cir. 2013).

[2]  A total of 36 defendants were named in the Infraud indictment.  One defendant has been dismissed.

not limited to, money laundering, trafficking in stolen means of identification; trafficking in, production and use of counterfeit identification; identity theft; trafficking in, production and use of unauthorized and counterfeit access devices; bank fraud; and wire fraud, as well as services in connection with all of those acts. *Id.* at 6, ¶ 1.

Mr. Telusma is accused of being a "vendor," providing "drop" services for other Infraud members as well as selling dumps. *Id.* at 16. "Vendors" (a.k.a. "Professors" or "Doctors") allegedly sold illicit products and services to other Infraud members:

> These sales may occur through the vendor's own website, to which would-be purchasers are directed by the advertisements they pay for and place on the Infraud Organization's web forum. Such sales may also occur directly between the vendor and customer, i.e. via email, [private message "PM"], or [instant messaging electronic communication service ("ICQ") or "chat"]. Products sold by vendors are reviewed on the forum by Infraud members, to ensure that vendors of low-quality goods do not remain in business with the Organization. This helps to cement the Organization's reputation as a premiere online destination for safe, high-quality and readily-available fraud-related contraband.

*Id.* at 13, ¶ 6.d.[3]

Telusma is charged in count one with racketeering conspiracy in violation of 18 U.S.C. § 1962(d). Count one alleges the defendants were employed by and associated with the Infraud "enterprise" and knowingly conspired to violate § 1962(c) by participating in a pattern of racketeering activity consisting of multiple acts indictable under 18 U.S.C. § 1028 (fraud and related activity in connection with identification documents, authentication features, and information), § 1029 (access device fraud), § 1343 (wire fraud), § 1344 (bank fraud), and § 1543 (forgery or false use of passport). ECF No. 303 at 24, ¶ 12. With regard to overt racketeering acts, Telusma is accused as follows:

> 14.24    On or about August 18, 2011, **Telusma [16]** received in excess of 15 compromised credit card numbers from **Unindicted Co-conspirator A**….
>
> 14.28    On or about September 15, 2011, **Unindicted Co-conspirator A** sent **Telusma [16]** in excess of 15 compromised credit card dumps via email….

---

[3] Among other things, vendors allegedly sold "dumps," which refers to compromised credit card account data, including an account holder's name, date of birth, social security number, address, telephone number, and mother's maiden name, as well as the security code on the back of the credit card. *Id.* at 8, ¶ 3.e–f. The term "drops" generally refers to protected drop sites, *i.e.*, a location or individual able to securely receive and then forward retail items obtained via fraud. *Id.* ¶ 3.g.

14.109  On or about March 26, 2015, **Telusma [16]** requested via private message that **Bondarenko [1]** ban another Infraud member for "ripping" him on a deal.

*Id.* at 28, 37.

## II.    THE SEARCH WARRANTS

The motion to suppress addresses a single search warrant issued in the Eastern District of New York, executed February 6, 2018, authorizing the seizure of an iPad, a smartphone, a MacBook Pro, and non-electronic documents or records regarding ownership and/or possession of the searched premises located in Brooklyn, New York.  The government's response points out that at least *three* search warrants were issued in this investigation relating to Mr. Telusma.  The suppression motion does not challenge the subsequent warrants.  However, the court will briefly summarize the relevant portions of the affidavits submitted in support of the search warrant applications.

### A.  The First Warrant

On February 5, 2018, U.S. Magistrate Judge James Orenstein of the Eastern District of New York issued the first search and seizure warrant ("first warrant") for the residence located at 42 Paerdegat 5th Street, Brooklyn, New York ("Brooklyn property").  *See* search and seizure warrant & application, Mot. Ex. A (ECF No. 475-1).  Special Agent Lynda Interlandi ("SA Interlandi") of Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"), submitted a 33-page affidavit in support of the application.  SA Interlandi provided details of her training and experience on, among other things, cybercriminal organizations and electronic forensic evidence.  *E.g.*, *id.* at 19–21, 30–36.

The affidavit provides details of the Infraud indictment and the alleged racketeering conspiracy in furtherance of an online criminal carding organization known as Infraud.[4]  *Id.* at 14–20, 22–25.  The affidavit indicates that Bonderenko was a member of the Carder.su criminal carding organization until he had a falling out with its leaders, broke ties and with co-defendant

---

[4]  As defined in the first warrant, "carding" means

the general concept of purchasing retail items with counterfeit credit cards or stolen credit card information.  Such scheme may involve a counterfeit credit card that has been encoded with the legitimate victim account information, and is presented to a store's cashier by the offender.  Often, various false identification documents are used to facilitate this fraud….

ECF No. 475-1 at 8, ¶ I.3.a.

Medvedev formed the Infraud Organization, successfully recruiting Carder.su members to join him. Telusma provided "cashout"[5] and drop services to other Infraud members, *id.* at 22, and the affidavit describes his alleged criminal activity in furtherance of the RICO conspiracy, *id.* at 24–25. His alleged racketeering acts include receiving in excess of 15 compromised credit card numbers in multiple emails from an unindicted co-conspirator in August and September 2011. In March 2015, he also requested via private message on the Infraud forum that the organization's leader/indicted co-conspirator ban another Infraud member for "ripping" him on a deal.

SA Interlandi stated that the investigation revealed that Telusma had possession of several digital devices and continued to conduct carding activities. Based on this information, SA Interlandi believed that one or more of these devices would be located at the Brooklyn property. As relevant to this motion, she described:

> 35. On July 31, 2017, TELUSMA posted a photo with the caption "If your trying to make money... Here's a gift from me, don't forget where you got it!" The photo was of a chat screen displayed on a phone, involving an individual listed as "Monnaie INF," with a message from that individual stating: "Hello! We made new shop to have better service. (CVV CCV CC Dumps) Updates every day. Choose stuff from lists we have in the shop." That message included a link to the alleged online dumps shop.
>
> 36. On January 17, 2018, TELUSMA posted a photograph of himself that included a smartphone that he was holding, and a cell-phone holster he was wearing, in what appeared to be a residence.
>
> 37. In January 10, 2018, TELUSMA posted a photograph of a phone bill from Verizon, with the quote "What my phone bill be like."
>
> 38. On August 26, 2017, TELUSMA posted a photograph of what appears to be an iPad in a residence.

*Id.* at 26–27. Based on SA Interlandi's training and experience, and that of other federal agents, she stated:

> individuals who commit electronic and Internet-based crimes, to include fraud and carding, generally possess multiple digital devices that they use to commit these crimes. Moreover, these individuals often retain old digital devices rather than sell them or dispose of them because they are aware that the devices contain contraband, and they do not wish to risk their criminal activity being discovered by the new

---

[5] The term "cashout service" in the affidavit is used to "describe the transfer of funds, typically used in connection with obtaining and laundering illicitly obtained funds from compromised bank and credit card accounts. The members providing cashout services receive a fee, which is typically between five percent and ten percent of the total funds laundered." ECF No. 475-1 at 10, ¶ I.3.n.

owner of their old devices, amongst other reasons. This is also the reason that such individuals own digital devices themselves, rather than using others' devices, as they do not wish to engage in their activities on digital devices owned by others and in doing so risk discovery.

*Id.* at 27–28, ¶ 40. Additionally,

Based on actual inspection of other evidence related to this investigation, including, among other things, email records, social media accounts, and other electronic communications, I am aware that computer equipment was used to access the Infraud Organization's forum, and to provide anonymous communications between members of the Organization in furtherance of the enterprise. Given that electronic communications played a significant factor in the furtherance of the enterprise, and that the individual residing at the [Brooklyn property] is a member of the Organization, there is reason to believe that there are computers and other digital devices currently located at the [Brooklyn property].

*Id.* at 31–32, ¶ 48.e.

SA Interlandi attested there was probable cause to believe a search of the Brooklyn property would lead to the discovery of evidence as fully described in Attachment B, "Property to be Seized." The attachment states the "items to be seized are the evidence, fruits, and instrumentalities" of 18 U.S.C. § 1962(d) (racketeering conspiracy), § 1028(a)(7) (identity theft), § 1029(a)(3) (possession of more than fifteen unauthorized access devices), § 1030 (computer fraud and related activity), § 1343 (wire fraud), § 1344 (bank fraud), and § 1956 (money laundering), specifically:

a. An IPad, a smartphone, a MacBook Pro that may be used to access the Infraud Organization's forum via the Internet, and that may contain stored references to the Infraud nic "peterelliot," or to any other Infraud nic.[6]

b. Any and all non-electronic documents or records regarding ownership and/or possession of the [Brooklyn property].

ECF No. 475-1 at 40.

Judge Orenstein issued the first warrant on February 5, 2018. *Id.* at 2. Federal agents executed this warrant at the Brooklyn property the following day. *Id.* at 5.

**B. Supplemental Warrant**

On February 6, 2018, Judge Orenstein issued a second search warrant ("supplemental warrant") for the Brooklyn property. *See* search and seizure warrant & application, Resp. Ex. A

---

[6] The affidavit states that the term "nic" refers to "the screen name or nickname chosen by a member of the criminal organization by which that member will be known to other members." Mot. Ex. A (ECF No. 475-1) at 8, ¶ I.3.d.

(ECF No. 515-1).  Special Agent Gregory P. Itsines ("SA Itsines") of ICE/HSI submitted an affidavit in support of the supplemental warrant application, which incorporated the first warrant's affidavit and provided additional facts supporting the request to seize additional evidence. Specifically, judicial authorization was sought to seize additional digital devices discovered during execution of the first warrant including an iPhone, an external hard drive, a MacBook Pro laptop, and a USB thumb drive as well as unused credit card "blanks," which agents recognized were used in the creation of counterfeit credit cards, identification documents, and other access devices.

During the search of the Brooklyn property authorized by the first warrant, agents related how they identified Telusma's bedroom where he was sleeping prior to their arrival. *Id.* at 3, ¶¶ 4–5.  While searching his bedroom, SA Interlandi observed multiple digital devices, including an iPhone, external hard drive, and USB thumb drive. *Id.*, ¶ 6.  SA Itsines represented, based on his training and experience:

> I know that such items, specifically Iphones are used by individuals who are members of groups such as the Infraud Organization to access the organization's "virtual clubhouse" on the Internet, to communicate with other members, to facilitate Internet-based criminal activity, and to store evidence related to such activity.
>
> … [I]ndividuals who make counterfeit credit cards utilize external drives, such as thumb drives to store information related to manufacturing such.
>
> Agent Interlandi also observed a box filled with unused, white credit card blanks, which I know from training and experience are used in the creation of counterfeit credit cards, identification documents, and other access devices.

*Id.*, ¶¶ 7–9.  Given these new facts, SA Itsines requested and received judicial authorization to seize evidence  described in Attachment B, "Property to be Seized."  *Id.*, ¶ 10.  The attachment stated the "items to be seized are the evidence, fruits, and instrumentalities" of 18 U.S.C. § 1962(d) (racketeering conspiracy), § 1028(a)(7) (identity theft), § 1029(a)(3) (possession of more than fifteen unauthorized access devices), § 1030 (computer fraud and related activity), § 1343 (wire fraud), § 1344 (bank fraud), and § 1956 (money laundering), specifically:

> a.     A black Western Digital-brand "My Passport" external hard drive;
>
> b.     A box of white unused credit card blanks;
>
> c.     A black iPhone.

d.    Any additional credit card making material: specifically credit card blanks, and holograms.

Attachment B, Notice of Corrected Doc. re: Resp. Ex. A (ECF No. 523) at 4.

Judge Orenstein approved the application for the supplemental warrant on February 6, 2018. *Id.* at 1. Federal agents executed the supplemental warrant later that day. *See* search warrant return & inventory sheet, Mot. Ex. A (ECF No. 475-1) at 3 & 5.

The first warrant and supplemental warrant authorized the search for and seizure of items, but did not authorize a search of the contents of the electronic devices. The digital devices were subsequently sent to the District of Nevada for use in this prosecution.

**C. July 6 Warrants**

On July 6, 2018, Magistrate Judge Carl W. Hoffman authorized the search of Telusma's digital devices seized at the Brooklyn property. *See* probable cause affidavit ("July 6 warrants"),[7] Resp. Ex. B (ECF No. 515-1). Special Agent Michael Adams ("SA Adams") of ICE/HSI submitted the affidavit applying for the July 6 warrants. SA Adams described his training and experience on, among other things, use and manufacture of counterfeit credit cards, false identification documents, money laundering, unlicensed money remitting, racketeering, and wire fraud. *Id.* at 3–4.

SA Adams noted that Judge Orenstein issued the first warrant and supplemental warrant for Telusma's residence at the Brooklyn property. He incorporated both warrants by reference and attached them as Exhibits 1 and 2. He explained that agents executed the first warrant on February 6, 2018. During their execution of the first warrant, agents observed other items that, based on

/ / /

/ / /

/ / /

---

[7] The government's response refers to this third application as a single warrant. *See* Resp. (ECF No. 515) at 4. However, separate warrants were requested and received for each device, supported by an identical affidavit supporting probable cause to search the contents of each of the devices seized in pursuant to the two warrants issued in the Eastern District of New York. Thus, the court uses the plural: "July 6 warrants." Additionally, the court notes that the response did not attach the signed and approved version of the July 6 warrants. However, Telusma's reply does not dispute that the July 6 warrants were issued in the form attached to the government's response, or that the government disclosed images of his seized devices during Discovery Production 3 in October 2018. *See* Resp. at 4–5.

their training and experience, were credit card "blanks," as well as numerous digital devices.[8]  The first warrant did not authorize the seizure of those devices.  Agents therefore returned to Judge Orenstein that day and obtained a supplemental warrant authorizing seizure of the carding material and devices the agents observed in Telusma's bedroom.  Pursuant to the supplemental warrant, agents returned to the Brooklyn property on February 6 and seized his digital devices:

> a.    Western Digital 1TB External Hard Drive, serial number WXA1A359RCF0
>
> b.    Apple Macbook Laptop, serial number W89340K691T, containing HGST 500GB Hard Drive, Serial Number 3TJ2GS8H
>
> c.    Apple iPad Pro, serial number DLXVR057HPQJ
>
> d.    Apple iPhone 8 Plus, serial number F2MVD5G5JCLM
>
> e.    Apple iPhone X, serial number DNPVQ4Y1JCL7

*Id.* at 5.  They also seized various credit card "blanks."  SA Adams knew, based on his training and experience:

> a.    Credit card "blanks" are blank credit card material utilized by carders to create fraudulent credit cards.
>
> b.    Digital devices, such as smart phones, computers, and various electronic storage media are necessary to obtain compromised credit and debit card information, and to facilitate the creation of fraudulent credit and debit cards and identifications using "blanks," such as the ones found in the [Brooklyn property].

*Id.* at 5–6, ¶ 6.

SA Adams informed Judge Hoffman that the supplemental warrant did not authorize examination of the contents of Telusma's devices, but only authorized their seizure.  Agents from the Eastern District of New York did not examine the contents of the devices.  SA Adams received the devices from those agents on March 13, 2018.  At that time, SA Adams and his fellow agents assumed they "had a search warrant that not only authorized seizure of the DEVICES, but also examination of any seized devices."  *Id.* at 6, ¶ 8.  Judge Hoffman was informed that between

---

[8]  The affidavit defines "digital devices" to include:

> any electronic system or device capable of storing or processing data in digital form, including central processing units; forensic images of computers, desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, *mobile telephones, and smart phones*; digital cameras; [and] peripheral input/output devices….

*Id.* at 7–8, ¶ 12 (emphasis added).

April 2 and 18, 2018, Task Force Officer Taun Yurek imaged the devices and began his examination of their contents. *Id.*, ¶¶ 7–8. Due to other case priorities and digital device examinations, officer Yurek did not complete the examination. *Id.*, ¶ 8. There was no further examination of the devices from April 18 through the date of the application. *Id.*

On May 31, 2018, SA Adams discovered that the first warrant did not address examination of the devices, and that officer Yurek's examination of the forensic images of the devices was likely not authorized by the first warrant as SA Adams had mistakenly believed. *Id.*, ¶ 9. Thus, SA Adams made the application for the July 6 warrants to authorize a search of Telusma's devices seized pursuant to the supplemental warrant. SA Adams's affidavit did not reveal any information learned by Yurek from the search of the seized devices.

Based on the facts set forth in the affidavit incorporating the facts described in the attached first warrant and supplemental warrant, SA Adams attested there was probable cause to believe that a search of Telusma's devices would lead to the discovery of evidence as fully described in Attachment B, "Particular Things to be Seized." *Id.* at 16–18. The attachment requested judicial authorization to seize: "[a]ll records relating to violations" of 18 U.S.C. § 1028(a)(1) (unlawful trafficking in and production of counterfeit identification documents or authentication features), § 1028(a)(7) (identity theft), § 1029(a)(3) (possession of more than fifteen unauthorized access devices), § 1030 (computer fraud and related activity), § 1343 (wire fraud), § 1344 (bank fraud), and § 1962(d) (racketeering conspiracy). *Id.* at 16. Specifically, records such as:

    1.    Records related to the Infraud Organization, to include records relating to the use and administration of the Organization's forum, website, or other related servers, from the date of October 2010 to the present date.

    2.    Records constituting indicia of membership in the Infraud Organization, from the date of October 2010 to the present date.

    3.    Records related to the nic "PeterElliot" within the Infraud Organization and other carding organizations, from the date of October 2010 to the present date.

    4.    Records containing or otherwise pertaining to electronic communications regarding the Infraud Organization, other carding organizations, or the crimes of access device fraud, wire fraud, identity theft, bank fraud, money laundering, unauthorized computer access, and racketeering, from the date of October 2010 to the present date.

    5.    Records related to any other nic used within the Infraud Organization, or

used within other carding organizations on the Internet or dark web, from the date of October 2010 to the present date….

ECF No. 515-2 at 16–17.

Judge Hoffman approved SA Adam's application and issued the July 6 warrants on July 6, 2018. Resp. (ECF No. 515) at 4.

## III. THE PARTIES' POSITIONS

### A. The Motion to Suppress (ECF No. 475)

Telusma's motion asks the court to suppress evidence seized during a search at his residence pursuant to the first warrant executed in the Eastern District of New York arguing the warrant is overbroad and lacks particularity. He claims the first warrant is overbroad because it authorizes the seizure of two iPhones, and the supporting affidavit did not articulate probable cause to show that Telusma used a smartphone to facilitate the alleged fraudulent transactions. He claims there is no evidence in the affidavit reflecting that Telusma used a smartphone or an iPhone to participate on the Infraud forum. The affidavit contains two references to smartphones, which may confirm that Telusma owned a cell phone but do not verify that he used a cell phone to participate in the Infraud forum or that the cell phone he used was an iPhone. SA Interlandi represented that, in her "training and experience . . . individuals who commit electronic and Internet-based crimes, to include fraud and carding, generally possess multiple digital devices that they use to commit these crimes." Affidavit, Mot. Ex. A (ECF No. 475-1) at 27–28, ¶ 40. Telusma claims this statement is "highly generalized and not particularly persuasive." Mot. at 7. He contends that for probable cause to exist, the affidavit must establish that Telusma: (1) must have owned a cell phone; (2) that cell phone must have been an iPhone; and (3) that iPhone must have been used to perpetrate the criminal activity under investigation. *Id.* at 6–7.

Alternatively, Mr. Telusma argues the first warrant failed to place practical limitations on the agents' discretion because it: (1) authorized seizure of evidence related to violations of seven broad criminal statutes; (2) authorized seizure of devices instead of specific documents or files; and (3) lacked any temporal limitation. With regard to "Property to be Seized," Attachment B to the affidavit states that the "items to be seized are the evidence, fruits and instrumentalities" of 18 U.S.C. § 1962(d) (racketeering conspiracy), § 1028(a)(7) (identity theft), § 1029(a)(3) (possession

10

1  of more than fifteen unauthorized access devices), § 1030 (computer fraud and related activity),

2  § 1343 (wire fraud), § 1344 (bank fraud), and § 1956 (money laundering), "*specifically*:  a. *An*

3  *IPad, a smartphone, a MacBook Pro* that may be used to access the Infraud Organization's forum

4  via the Internet, and that may contain stored references to the Infraud nic 'peterelliot,' or to any

5  other Infraud nic"….[9]  Mot. Ex. A (ECF No. 475-1) at 4 (emphasis added).

6        Telusma asserts that "the reference to the criminal activity under investigation" represents

7  the only limitation on the agents' discretion in conducting the search.  Mot. at 8.  He contends the

8  first warrant could have been more particular.  For example, it could have requested seizure of

9  "evidence relating to the purchase or sale of compromised credit cards," "evidence of contacts

10  with the Infraud forum," or "evidence of contacts with Bondarenko or Medvedev (the alleged

11  leaders of Infraud forum)."  *Id.* at 9.  Additionally, he argues the lack of time limitation would

12  allow agents to review documents on these devices at any time, without regard to when the

13  suspected criminal activity took place.  This amounts to a wholesale rummaging through a person's

14  belongings, which the Fourth Amendment prohibits.  The court should suppress evidence of the

15  devices and all of the evidence gathered from the four seized devices.

16        **B.  The government's Response (ECF No. 515)**

17        In response, the government notes that Telusma's arguments focus solely on the first

18  warrant and ignore the supplemental warrant authorizing the seizure of the smartphones and other

19  devices, and the July 6 warrants authorizing the search of those devices.  Reading all these warrants

20  together in context, the search and seizure of Telusma's devices was lawful, and the fruits of the

21  search should not be suppressed.

22        The government maintains that Judge Orenstein correctly found probable cause that

23  Telusma's smartphones contained evidence of criminal activity.  The response points out that

24  Telusma does not argue investigators lacked probable cause to believe he was involved in the

25  crimes under investigation.  Rather, he argues that probable cause did not exist to seize the two

26

27  [9]  The affidavit states that the term "nic" refers to "the screen name or nickname chosen by a member of
the criminal organization by which that member will be known to other members."  Mot. Ex. A (ECF

28  No. 475-1) at 8, ¶ I.3.d.

iPhones.  However, the supplemental warrant authorized seizure of the iPhones after agents discovered those phones in Telusma's bedroom during execution of the first warrant.  Resp. at 6.

The government also asserts there was probable cause to believe Telusma's cell phones were likely used to commit crimes, and likely contained evidence of those crimes.  The affidavit for the first warrant showed that Telusma was engaged in a number of electronic and Internet-based crimes that require the use of digital devices to commit.  "Because the Defendant must have used digital devices to commit his crimes, it was reasonable to seek evidence of those crimes on any digital devices that the Defendant owned, including the iPhones."  *Id.* at 7.  Smartphones, such as an iPhone, can be used to access criminal carding forums like Infraud and to communicate with co-conspirators.  Additionally, digital devices often store historical information related to criminal activity from before a device became operational, *e.g.*, imported contacts or email from another phone.  Telusma argues there was no probable cause to seize the iPhone X because it was "released" by Apple, *i.e.*, available for sale, in early November 2017, but the Infraud indictment was not returned until January 30, 2018, nearly three months later.  However, Infraud's members allegedly continued to commit crimes in furtherance of the racketeering conspiracy through the date of the Infraud indictment.  Thus, it was reasonable to conclude the iPhone X would contain evidence of criminal activity.

Finally, the response asserts that the July 6 warrants provided practical limitations and meaningful constraints on the search of Telusma's devices.  Although the first warrant may not have authorized seizure of any specific documents or files, the July 6 warrants authorizing a search of the contents of the devices that yielded the incriminating evidence Telusma seeks to suppress did.  The July 6 warrants authorized the seizure of 10 specific categories of records relevant  to the specific criminal violations referenced in the affidavit from October 2010 to the present.

For these reasons, the court should deny Telusma's suppression motion.

**C.  Mr. Telusma's Reply (ECF No. 522)**

The reply contends that Telusma's suppression motion turns on the level of connection required between the items the government seeks to seize and the crime under investigation.  He claims the government improperly relies on an assumption that Telusma *must have* used digital

devices to commit his alleged crimes, rather than articulating a tangible and articulable nexus between the crimes alleged and the devices seized. Probable cause to search required a connection between the crime alleged and the digital devices to be seized. Reading the affidavits in the light most favorable to the government, Telusma argues the government "has no idea how Telusma allegedly accessed the Infraud forum – whether through a laptop, a tablet, a smartphone, or a desktop at the local library." Reply at 3. The government was required tie the particular device to the crime alleged. Instead, Telusma claims the government sought "seizure of every device, found in any location, with any alleged connection to Telusma - no matter how tenuous - … so long as there was some possibility - no matter how remote - Telusma could have used it to initiate contact with the internet." *Id.* at 3–4.[10]

In addition, Telusma asserts that the transferrable nature of digital evidence requires the government to identify at least one device that Telusma used to access the Infraud forum and on which evidence is likely to be found. Although it is possible that a person may transfer data from one device to another, the mere possibility does not establish probable cause or provide the requisite link between the particular device to be seized and the alleged crime. Accordingly, Telusma asks the court to suppress the evidence resulting from the digital devices seized on February 6, 2018.

## DISCUSSION

### I. APPLICABLE LEGAL STANDARDS

The Fourth Amendment secures "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV. Evidence obtained in violation of the Fourth Amendment, and evidence derived from it may be

---

[10] In a long footnote, Mr. Telusma argues the record is unclear about what device was found during two possible searches of the Brooklyn property. *Id.* at 4 n.4. He acknowledges that the first warrant plainly "authorized the government to seize *an iPhone* and the MacBook Pro, if such devices were located." *Id.* (emphasis added). The affidavit supporting the supplemental warrant states that SA Interlandi "observed *an iPhone*" on Telusma's bed, *id.* (citing Feb. 6 warrant ¶ 6), but does not specify whether it was an iPhone 8 or iPhone X, and the agents prepared a single inventory of items seized for both searches. Mr. Telusma claims the government should be ordered to clarify which iPhone was found during which search and where in the house. Furthermore, even if agents located an iPhone in Telusma's bedroom, that fact "does not establish that this particular device - whichever iPhone it was - was used to access the online forum and it provides absolutely no nexus between *the other iPhone* and the crime alleged." *Id.*

suppressed as the "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 484–87 (1963); *United States v. Lundin*, 817 F.3d 1151, 1157 (9th Cir. 2016); *United States v. McClendon*, 713 F.3d 1211, 1215 (9th Cir. 2013) ("Searches and seizures that offend the Fourth Amendment are unlawful and evidence obtained as a direct or indirect result of such invasions is considered 'fruit of the poisonous tree' and is inadmissible under the exclusionary rule.").

The Fourth Amendment's Warrant Clause provides that a warrant may be issued only "upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. This language imposes three requirements. *Dalia v. United States*, 441 U.S. 238, 255 (1979). A valid search warrant must be: (1) issued by a neutral and detached judge; (2) supported by probable cause to believe the evidence sought will aid in a particular apprehension or conviction for a particular offense; and (3) describe the things to be seized and the place to be searched with particularity. *United States v. Artis*, --- F.3d ---, 2019 WL 1375260, at *3 (9th Cir. Mar. 27, 2019) (citing *Dalia*, 441 U.S. at 255).

### A.  Probable Cause

The probable cause standard is a fluid and nontechnical concept that is incapable of precise definition or quantification. *Maryland v. Pringle*, 540 U.S. 366, 370–71 (2003); *United States v. Hill*, 459 F.3d 966, 972 (9th Cir. 2006) (probable cause is "not readily susceptible to multifactor tests or rebuttable presumptions"). "Probable cause exists where the totality of the circumstances indicates a 'fair probability that . . . evidence of a crime will be found in a particular place'." *United States v. Elmore*, 917 F.3d 1068, 1074 (9th Cir. 2019) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)); *United States v. Alaimalo*, 313 F.3d 1188, 1193 (9th Cir. 2002) (probable cause requires only a fair probability or substantial chance of criminal activity). "This standard does not require the affidavit to establish that the evidence is in fact in the place to be searched, or even that it is more likely than not to be there." *Elmore*, 917 F.3d at 1074 (citing *United States v. Fernandez*, 388 F.3d 1199, 1254 (9th Cir. 2004)); *United States v. Kelley*, 482 F.3d 1047, 1050 (9th Cir. 2007) (neither certainty nor a preponderance of the evidence is required). "Rather, the issuing judge 'need only conclude that it would be reasonable to seek the evidence in the place indicated in the

affidavit'." *Elmore*, 917 F.3d at 1074 (quoting *Fernandez*, 388 F.3d at 1254).

It is well recognized that law enforcement officers can rely on their own experience, and the experience and information of other law enforcement officers, in establishing probable cause. *United States v. Butler*, 74 F.3d 916, 920–21 (9th Cir. 1996). An officer's "first hand knowledge" of a defendant's criminal conduct, combined with the officer's "experience" with other individuals who committed similar crimes, provides a "substantial basis" for a magistrate judge to determine that probable cause exists. *United States v. Johnson*, 913 F.3d 793, 802 (9th Cir. 2019) (citing *United States v. Terry*, 911 F.2d 272, 275–76 (9th Cir. 1990)). Similarly, a magistrate judge " 'may rely on the conclusions of experienced law enforcement officers regarding where evidence of a crime is likely to be found'." *Fernandez*, 388 F.3d at 1253 (quoting *Terry*, 911 F.2d at 275).

**B. Specificity**

Search warrants must be specific. *United States v. Hill*, 459 F.3d 966, 973 (9th Cir. 2006). "Specificity has two aspects: particularity and breadth. Particularity is the requirement that the warrant must clearly state what is sought. Breadth deals with the requirement that the scope of the warrant be limited by the probable cause on which the warrant is based." *Id.* (citing *United States v. Towne*, 997 F.2d 537, 544 (9th Cir. 1993)).

1.  Particularity

The purpose of the particularity requirement is to prevent general searches. *Maryland v. Garrison*, 480 U.S. 79, 84 (1987). By limiting the authorization to search the specific areas and things for which there is probable cause to search, the particularity requirement ensures that the search will be carefully tailored to its justifications, and will not become a wide-ranging, exploratory search that the Fourth Amendment prohibits. *Id.*; *In re Search of Google Email Accounts identified in Attachment A*, 92 F. Supp. 3d 944, 950 (D. Alaska 2015) (citing *Payton v. New York*, 445 U.S. 573, 584 n.21 (1980) (retracing the roots of the particularity requirement to the colonialists' objections to the writs of assistance)). The particularity requirement also prevents "exploratory rummaging in a person's belongings." *United States v. Rodriguez*, 869 F.2d 479, 486 (9th Cir. 1989) (citing *Andresen v. Maryland*, 427 U.S. 463, 480 (1976)). The need to prevent general exploratory rummaging of a person's belongings is particularly acute in document searches

because, unlike requests for other tangibles, document searches tend to involve broad disclosures of the intimacies of private lives, thoughts, and transactions. *United States v. Washington*, 797 F.2d 1461, 1468 (9th Cir. 1986). However, the Ninth Circuit has often recognized a legitimate law enforcement need to scoop up large quantities of data and sift through it carefully for concealed or disguised pieces of evidence. *See, e.g.*, *Hill*, 459 F.3d at 973.

To satisfy the particularity requirement the "description must be specific enough to enable the person conducting the search reasonably to identify the things authorized to be seized." *United States v. Fries*, 781 F.3d 1137, 1151 (9th Cir. 2015) (quoting *United States v. Smith*, 424 F.3d 992, 1004 (9th Cir. 2005)). In determining whether a warrant is sufficiently particular, the Ninth Circuit considers one or more of the following factors: (1) whether probable cause exists to seize all items of a particular type described in the warrant; (2) whether the warrant sets out objective standards by which the executing officers can differentiate items subject to seizure from those which are not; and (3) whether the government was able to describe the items more particularly in light of the information available to it at the time the warrant was issued. *See, e.g.*, *United States v. Turner*, 770 F.2d 1508, 1510 (9th Cir. 1985).

The warrant's description of items need only be "reasonably specific, rather than elaborately detailed." *Hill*, 459 F.3d at 973 (citing *United States v. Storage Spaces Designated Nos. 8 & 49*, 777 F.2d 1363, 1368 (9th Cir. 1985)). "Warrants which describe generic categories of items are not necessarily invalid if a more precise description of the items subject to seizure is not possible." *Id.* The level of specificity required "varies depending on the circumstances of the case and the type of items involved." *Id.*; *see also United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986) (detail necessary in a warrant is related to particular circumstances and nature of evidence sought). "[T]he scope of a lawful search is 'defined by the object of the search'." *United States v. Ewain*, 88 F.3d 689, 692 (9th Cir. 1996) (quoting *Garrison*, 480 U.S. at 84). The test is an objective one: "would a reasonable officer have interpreted the warrant to permit the search at issue." *United States v. Gorman*, 104 F.3d 272, 274 (9th Cir. 1996); *see also United States v. Leon*, 468 U.S. 897, 918–19 (1984); *United States v. Traylor*, 656 F.2d 1326, 1331 (9th Cir. 1981).

/ / /

16

1

2. <u>Breadth Requirement</u>

2      "The purpose of the breadth requirement is to limit the scope of the warrant by the probable

3   cause on which the warrant is based." *Fries*, 781 F.3d at 1151 (quoting *Smith*, 424 F.3d at 1004);

4   *see also Hill*, 459 F.3d at 973 (" 'Breadth deals with the requirement that the scope of the warrant

5   be limited by the probable cause on which the warrant is based'.") (quoting *United States v. Towne*,

6   997 F.2d 537, 544 (9th Cir. 1993)).  Stated differently, "overbreadth is a tailoring question: does

7   the proposed warrant limit the government's search to the specific places that must be inspected

8   to confirm or dispel the suspicion that gave rise to probable cause?" *In re Search of Google Email*,

9   92 F. Supp. 3d at 950 (citing *Garrison*, 480 U.S. at 84 ("By limiting the authorization to search to

10   the *specific areas* and things for which there is probable cause to search, the requirement ensures

11   that the search will be carefully tailored to its justifications, and will not take on the character of

12   the wire-ranging exploratory searches the Framers intended to prohibit.") (emphasis added)); *see*

13   *also United States v. Cardwell*, 680 F.2d 75, 78 (9th Cir. 1982); Wayne R. LaFave, *Search and*

14   *Seizure: A Treatise on the Fourth Amendment* § 3.7(d) at 546 (5th ed. 2012) (describing

15   overbreadth as the "object-place nexus" issue, and noting that the problem arises when a search

16   warrant describes "the place be searched in broader terms than is justified by the probable cause

17   showing in the affidavit.").

18   **C.  Standard of Review for Search Warrants**

19      The Supreme Court established the standard of review for the issuance of a search warrant

20   in *Illinois v. Gates*, 462 U.S. 213 (1983).  The issuing magistrate judge must make a practical,

21   common-sense decision whether, given totality of the circumstances set forth in the affidavit,

22   including the veracity and basis of knowledge of people supplying hearsay information, there is a

23   fair probability that contraband or evidence of a crime will be found in a particular place.  *Id*. at

24   238.  A reviewing court has a duty to ensure that the magistrate judge had a "substantial basis" for

25   concluding that probable cause existed.  *Ewing v. City of Stockton*, 588 F.3d 1218, 1223 (9th Cir.

26   2009) (citing *Gates*, 462 U.S. at 238–39).  In doubtful cases, the court should give preference to

27   the validity of the warrant.  *Kelley*, 482 F.3d at 1050–51 (citing *Gates*, 462 U.S. at 237 n.10).  The

28   court should not "flyspeck" the affidavit supporting a search warrant through de novo review;

1  instead, the magistrate's determination "should be paid great deference." *Id.* at 1051 (citing *United*

2  *States v. Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2006) (en banc)).    As a result, a judge's

3  determination that an affidavit provided probable cause to issue a search warrant "will be upheld

4  unless clearly erroneous."  *United States v. Alvarez*, 358 F.3d 1194, 1203 (9th Cir. 2004).

5  **II.    ANALYSIS AND DECISION**

6      Reviewing the affidavit as a whole, applying the totality of the circumstances test, and

7  showing the issuing judge great deference as the Supreme Court requires, the court concludes the

8  issuing magistrate judge had a substantial basis for concluding that probable cause existed to issue

9  the first warrant.   The affidavit informed Judge Orenstein about SA Interlandi's training and

10  experience in cybercriminal organizations and electronic forensic evidence.  Judge Orenstein was

11  allowed to rely on SA Interlandi's extensive training and experience in making his decisions.

12      The first warrant's affidavit describes the internet-based Infraud organization, the charges

13  against Mr. Telusma, and his alleged conduct.  SA Interlandi carefully described her reasons to

14  believe Telusma was residing at the Brooklyn property and why evidence would be found there.

15  The affidavit also provides detailed explanations of why SA Interlandi believed, based on

16  information learned during the investigation and her training and experience, that Telusma would

17  have an iPad, a smartphone, and MacBook Pro on which evidence of the racketeering conspiracy

18  and overt acts would likely be found.  SA Interlandi's representations sufficiently articulated her

19  reasons for believing that Telusma used internet-enabled digital devices, including a smartphone,

20  to facilitate the alleged fraudulent transactions.  Telusma does not contend that his devices lacked

21  the capability of connecting to the internet and/or sending electronic communications.  The court

22  finds that SA Interlandi's affidavit provided sufficient probable cause to search for Telusma's

23  devices.

24      Mr. Telusma claims the first warrant could have been more particular because it did not

25  specify that his smartphone was an iPhone or specify the iPhone model.  However, there is no

26  indication that agents involved in the Infraud investigation were aware of what type of smartphone

27  Telusma used at the time the first warrant was issued.  The affidavit related that the crimes under

28  investigation  were  committed  over  the  internet  using  digital  devices  and  that  Telusma  was

1    photographed using a smartphone and wearing a cell phone holster and he posted information

2    about his cell phone bill to Facebook.  *See Spilotro*, 800 F.2d at 963 (considering whether

3    government was able to describe items more particularly in light of information available to it at

4    the time the warrant was issued).  The first warrant requested judicial authorization to seize an

5    iPad, a smartphone and a MacBook Pro.  SA Interlandi's affidavit meticulously explained how

6    investigators were able to identify Telusma and the email account and "nics" he was using to

7    participate in Infraud's crimes.  She attested how she knew Telusma was in control of an Infraud

8    "nic" and registration email account.  She attested that investigators discovered several instances

9    of Telusma receiving compromised credit card numbers on this email account, and that multiple

10   emails sent from the account indicated the emails were "sent from my iPad."

11       The affidavit for the first warrant also related that Telusma posted a photograph of himself

12   using a smartphone, and a cell phone holster he was wearing, a Verizon phone bill, and what

13   appeared to be an iPad in a residence.  Telusma also posted a photograph of a MacBook Pro with

14   the quote "I love this 'Mac', I spent 5k on it when it first came out. It help me make thousands till

15   this day. I'll never get rid of it. It has made its way into my 'Hall of Fame' …"  ECF No. 475 at

16   27, ¶ 39.  The request to seize an iPad, a smartphone and a MacBook Pro was clearly based on

17   information learned in the investigation, and stated as specific a description as investigators could

18   provide.  *See Fries*, 781 F.3d at 1151 (requiring a specific enough description "to enable the person

19   conducting the search reasonably to identify the things authorized to be seized").  The first warrant

20   was reasonably tailored to seize devices Telusma was allegedly using to commit the cybercrimes

21   described.  The devices were described with as much particularity as possible based on what

22   investigators knew at the time.  Moreover, the fact that the supplemental warrant was requested

23   and received demonstrates that the first warrant was not overbroad.  When officers executing the

24   search for three devices found credit card blanks used to create counterfeit credit cards and other

25   identification documents and additional digital devices, they sought and obtained another warrant.

26   The supplemental warrant specifically described the additional devices found in Telusma's

27   bedroom with the credit card blanks and why investigators believed these devices would have

28   evidence of the enumerated offenses on them.

Telusma's motion to suppress challenges only the first warrant issued for three electronic devices. The first warrant also authorized seizure of non-electronic documents or records showing control of the searched premises.[11] Rather, Telusma argues that the first warrant was overbroad and lacked specificity because it did not limit the scope of the search of the contents of the devices. However, the electronic devices seized pursuant to the first warrant and supplemental warrant were not searched until they were returned to this district for use in this prosecution. Telusma does not claim the warrants issued by Judge Hoffman in July 2018 were overbroad or lacking in particularity. The July 6 warrants limited the search to evidence of the crimes at issue in this prosecution on the devices seized pursuant to the first warrant and supplemental warrant from October 2010 through the date the warrants were issued. Telusma does not claim that the government intends to use electronic data found on the electronic devices searched pursuant to the July 6 warrants outside the scope of what Judge Hoffman authorized.

The Ninth Circuit has repeatedly acknowledged that over-seizing "is an accepted reality in electronic searching because there is no way to be sure exactly what an electronic file contains without somehow examining its contents." *United States v. Flores*, 802 F.3d 1028, 1044–45 (9th Cir. 2015) (quoting *United States v. Comprehensive Drug Testing, Inc.* ("*CDT*"), 621 F.3d 1162, 1177 (9th Cir. 2010) (en banc)) (internal quotation and alteration omitted). Data that individuals used to keep in file cabinets in physical facilities are now routinely stored electronically, and law enforcement faces many challenges in retrieving electronically stored information. *CDT*, 621 F.3d at 1175. Additionally, digital files are easy to disguise or rename; thus, were courts to limit a warrant to a narrow search protocol, "much evidence could escape discovery" simply because a defendant can mislabel the files documenting his criminal activity. *United States v. Adjani*, 452 F.3d 1140, 1150 (9th Cir. 2006). Because of the challenges involved in searches of electronically stored information, the Ninth Circuit has recognized law enforcement's "legitimate need to scoop up large quantities of data, and sift through it carefully for concealed or disguised pieces of

---

[11] The motion to suppress does not claim that the agents' seizure of non-electronic records was overbroad undoubtedly because the search warrant return indicates the executing agents seized only three pieces of mail addressed to Telusma at the searched premises.

1  evidence." *CDT*, 621 F.3d at 1176.[12]

2      Based on factual and practical considerations of everyday life on which reasonable and

3  prudent people act, the evidence presented in the affidavit supporting the first warrant established

4  the probability that evidence of Telusma's crimes would be found at the Brooklyn property, the

5  premises to be searched, on Telusma's digital devices, the property to seized and to be searched.

6  *See Gates*, 462 U.S. at 235 ("only the probability, and not a prima facie showing of criminal

7  activity, is the standard of probable cause").  The first warrant was neither overbroad nor lacking

8  in specificity.  The court therefore finds that the issuing magistrate judge had a substantial basis

9  for concluding that probable cause existed. Telusma's Fourth Amendment rights were not violated.

10     For these reasons,

11     **IT IS RECOMMENDED** that defendant John Telusma's Motion to Suppress Evidence

12  (ECF No. 475) be **DENIED**.

13     DATED this 15th day of April 2019.

14

15  _____
    PEGGY A. LEEN

16  UNITED STATES MAGISTRATE JUDGE

17

18

19

20

21

22

23

24

---

25  [12] The Ninth Circuit has also repeatedly rejected overbreadth arguments that a search warrant should have authorized a pinpointed search and seizure of digital devices and data rather than a wholesale search.  *E.g.*,

26  *Flores*, 802 F.3d at 1044 (rejecting overbreadth argument where "only approximately 100 pages were truly responsive to the warrant" that authorized to search and seizure of "all 11,000 pages of data" in a Facebook

27  account); *Adjani*, 452 F.3d at 1149–50 (requiring "a pinpointed computer search, restricting the search to an email program or to specific search terms, would likely have failed to cast a sufficiently wide net to

28  capture the evidence sought.").